IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 25, 2014 Session

**DANNY LONG** ET AL. **v.**
**QUAD POWER PRODUCTS, LLC** ET AL.

**Appeal from the Circuit Court for Hamilton County**
**No. 03C1789      W. Jeffrey Hollingsworth, Judge**

_____

**No. E2013-02708-COA-R3-CV-FILED-MARCH 20, 2015**

_____

This is a product liability action arising from a workplace injury to the plaintiff, Danny Long.  Mr. Long's left arm was severely injured on October 30, 2002, when a reducing mechanism attached to a ball valve he was using suddenly broke, causing a release of pressurized air and water onto his left arm and shoulder.  Following lengthy medical treatment and multiple surgeries, Mr. Long's left arm was amputated.  On October 30, 2003, Mr. Long and his wife filed a complaint alleging, *inter alia*, negligence in the design, manufacture, assembly, distribution, and sale of the ball valve, as well as failure to warn of potential danger to users of the ball valve and failure to include with the ball valve adequate safety information relative to its use.  The Longs named four companies as defendants allegedly responsible for the design, manufacture, assembly, distribution, and sale of the ball valve.  Mr. Long's employer was subsequently joined as an intervening plaintiff.  Through the course of the proceedings, the trial court granted summary judgment in favor of two of the defendant companies on the basis of lack of personal jurisdiction.  These defendants are not parties to this appeal.  Mr. Long died on December 22, 2006, and Ms. Long thereafter by substitution assumed his interest in this action.  In May 2010, the trial court granted Ms. Long and the intervening plaintiff permission to amend the complaint to reassert a strict liability claim against the two remaining defendant companies based upon the sole theory of failure to warn.  In May 2013, the two remaining defendants subsequently filed separate motions for summary judgment. Finding that no genuine issue of material fact existed that could establish strict liability based upon failure to warn, the trial court granted summary judgment in favor of both remaining defendants.  Ms. Long and the employer appeal.[1]  Discerning no error, we affirm.

_____

[1]During the pendency of this appeal, Ms. Long and the employer voluntarily dismissed this appeal against one of the two remaining defendants, pursuing their appeal solely against one defendant company, Southern Fluidpower, Inc.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, delivered the opinion of the court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Stephen T. Greer, Dunlap, Tennessee, for the appellant, Geraldine Long, and Jeffrey L. Cleary, Chattanooga, Tennessee, for the appellant, Alstom Power, Inc.

Thomas E. LeQuire and Lance W. Thompson, Chattanooga, Tennessee, for the appellee, Southern Fluidpower, Inc.

**OPINION**

I.  Factual and Procedural Background

Plaintiff Danny Long was fifty-three years old when the accident resulting in severe injury to his left arm occurred on October 30, 2002.  He was employed as a boilermaker at the Chattanooga location of Alstom Power, Inc., ("Alstom"), which manufactures tubular products, including water wall panels and super heaters for the power generation industry.  While pressure testing a product, Mr. Long attempted to turn a ball valve to release pressure on a super heater test panel through which highly pressurized water was moving.  The test panel itself had been designed and assembled by Alstom employees.  When the ball valve would not turn, Mr. Long used an extension or "cheater" bar to continue his attempt to relieve pressure.  The reducing mechanism, a three-eighth-inch carbon nipple connected to the valve, then broke, causing water under extremely high pressure, 6,975 pound-force per square inch ("psi"), to release onto Mr. Long's left arm and shoulder.  Mr. Long required immediate, emergency medical care and underwent multiple surgeries, culminating in the amputation of his left arm.

One year following the accident, on October 30, 2003, Mr. Long and his wife, Geraldine Long, filed a complaint pursuant to the Tennessee Products Liability Act of 1978 ("TPLA").  *See* Tenn. Code Ann. §§ 29-28-101 through 108 (2012).  The Longs alleged negligence in the design, manufacture, assembly, distribution, and sale of the ball valve; breach of implied and express warranties; failure to warn; failure to exercise due care; and failure to include with the ball valve adequate safety information relative to its use.  The Longs named four defendants.  The ball valve had been manufactured by defendant Pister Kugelhähne GmbH ("Pister"), a corporation based in Germany.  Pister distributed its products in the United States through defendant Pressure Components, Inc. ("PCI"), a corporation based in Ohio.  Alstom purchased the ball valve in question by ordering it, using the valve's PCI catalog number, from defendant Southern Fluidpower,

2

Inc. ("Southern"), a corporation based in Tennessee. PCI thus distributed the ball valve through Southern, which in turn sold it to Alstom.

The fourth defendant, Quad Power Products, LLC ("Quad Power"), based in Missouri, was granted summary judgment by the trial court in November 2005 without objection from the other parties.[2] Quad Power had asserted in its motion for summary judgment that although it was a distributor of PCI products, it had never distributed products in Tennessee, had no contacts in Tennessee, and had never dealt with Alstom. Pister, the manufacturer based in Germany, was subsequently granted summary judgment by the trial court in November 2009 on the basis of lack of personal jurisdiction. The court found that Pister did "not meet the minimum contact standard set forth in the Tennessee Long Arm Statute and applicable case law." *See* Tenn. Code Ann. §§ 20-2-214(a)(6) (2009), 20-2-225 (2009); *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 740-41 (Tenn. 2013) (analyzing the minimum-contact standard in reinstating the trial court's grant of summary judgment in favor of a foreign manufacturer). The two remaining defendants at the time Ms. Long and Alstom filed this appeal were PCI and Southern. During the pendency of this appeal, Ms. Long and Alstom voluntarily dismissed this appeal as to PCI. Southern is therefore the only remaining defendant involved in this appeal.

Southern filed an answer to the original complaint on December 10, 2003, asserting several affirmative defenses, including, as relevant to this appeal, that Mr. Long's negligence and/or the negligence of another actor caused Mr. Long's injury. The trial court granted Alstom permission to file an intervening petition on May 12, 2004, asserting a right of subrogation for Workers' Compensation benefits it had paid or would pay to Mr. Long.

On December 19, 2005, Southern filed a motion for summary judgment, asserting that although it was a distributor of PCI products, it did not distribute the ball valve in question to Alstom. Alstom filed a response on February 1, 2006, presenting "recently discovered documents," including a purchase release document and affidavit showing that Alstom's director of supply management had in fact purchased the ball valve from Southern. Southern subsequently withdrew its initial motion for summary judgment on March 23, 2006.

---

[2]This action originally came before Judge Jacqueline E. Schulten, who entered an order recusing herself on April 5, 2005. Judge Samuel H. Payne then heard the case through the grant of summary judgment to Quad Power in November 2005. By the time of the court's ruling on Southern's first motion for summary judgment in November 2006, Judge W. Jeffrey Hollingsworth was presiding over the case and continued to hear it through entry of the final judgment appealed here.

Two months later on May 12, 2006, Southern filed a second motion for summary judgment, asserting, *inter alia*, that while it distributed Pister ball valves for PCI, the valves were only in Southern's possession for approximately twenty-four hours and were not assembled, designed, manufactured, or altered by Southern. The trial court granted this motion on November 15, 2006, upon the court's finding that no opposing brief had been filed for more than six months and that the motion was well taken.

Mr. Long died on December 22, 2006. Pursuant to Tennessee Rule of Civil Procedure 25.01, Ms. Long filed a suggestion of death in July 2007. The trial court accordingly entered an order on August 27, 2007, reviving this action and substituting Ms. Long for and on behalf of Mr. Long pursuant to Rule 25.01 and Tennessee Code Annotated §§ 20-5-102 (2009).

As to Southern, Ms. Long filed a motion on January 14, 2010, requesting that the trial court revise its previous order granting summary judgment due to the court's intervening grant of summary judgment to Pister. *See* Tenn. Code Ann. § 29-28-106(4) (2012) (providing in relevant part that a product liability action shall not be commenced or maintained against "any seller, other than the manufacturer, unless . . . [t]he manufacturer or distributor of the product or part in question is not subject to service of process in this state and the long-arm statutes of Tennessee do not serve as the basis for obtaining service of process . . . ."). Upon consideration of this motion, the trial court reinstated Ms. Long's claim against Southern as to strict liability only in an order entered February 16, 2010. Southern responded by filing a motion for interlocutory appeal of the trial court's decision to reinstate the strict liability claim. The trial court denied this motion in an order entered April 20, 2010. Upon a subsequent motion filed by Ms. Long, the trial court granted her permission in an order entered May 19, 2010, to amend the complaint to state that Southern is a "seller" pursuant to the TPLA. *See* Tenn. Code Ann. § 29-28-106.

On May 3, 2013, Southern filed a motion for summary judgment, to which Ms. Long and Alstom responded. The trial court, finding that no genuine question of material fact existed to support Ms. Long's claim that Southern's failure to warn had caused Mr. Long's accident, entered a Memorandum Opinion and Order granting summary judgment in favor of Southern on September 17, 2013. Ms. Long and Alstom timely appealed.

## II. Issues Presented

Ms. Long and Alstom present four issues on appeal, which we have restated slightly:

4

1. Whether the trial court erred by finding that Southern had not failed to properly warn Mr. Long and Alstom concerning the pressure capacity of the valve at issue.

2. Whether the trial court erred by finding that Southern had not failed to properly warn Mr. Long and Alstom concerning the proper usage of the valve at issue.

3. Whether the trial court erred by discounting the testimony of Ms. Long's and Alstom's expert witness.

4. Whether the trial court erred by finding the actions of Alstom, as Mr. Long's employer, to be an intervening cause of Mr. Long's injury.

## III. Standard of Review

Our Supreme Court has succinctly described the applicable[3] standard of review of a trial court's grant of summary judgment:

A summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008). When ruling on a summary judgment motion, the trial court must accept the nonmoving party's evidence as true and resolve any doubts concerning the existence of a genuine issue of material fact in favor of the nonmoving party. *Shipley v. Williams*, 350 S.W.3d 527, 536 (Tenn. 2011) (quoting *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 84 (Tenn. 2008)). "A grant of summary judgment is appropriate only when the facts and the reasonable inferences from those facts would permit a reasonable person to reach only one conclusion." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)). "The granting or denying of a motion for summary judgment is a matter of law, and our standard of review is de novo with no presumption of correctness." *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010).

---

[3]The recently enacted Tennessee Code Annotated § 20-16-101 (Supp. 2012), 2011 Tenn. Pub. Acts 498, is applicable only to cases commenced on or after July 1, 2011, and therefore is not applicable to this case. Tennessee Code Annotated § 20-16-101 provides a standard of review for summary judgment with the stated purpose "to overrule the summary judgment standard for parties who do not bear the burden of proof at trial set forth in *Hannan v. Alltel Publishing Co.*, its progeny, and the cases relied on in *Hannan*." *See Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 25 n.2 (Tenn. 2011).

*Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013). Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has recently instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014).

## IV. Failure to Warn Claim Pursuant to TPLA

It is undisputed that Ms. Long's only remaining claim at the time the instant motion for summary judgment was heard was the allegation that Southern failed to provide adequate warning regarding improper use of the ball valve that could render it a dangerous product. Ms. Long specifically alleges that Alstom, and thus Mr. Long as the end user, should have been warned regarding the danger of using the ball valve (1) with a higher level of pressure than it had been designed to withstand and (2) in a system conveying water due to the risk of corrosion. Southern contends that the trial court properly found that no genuine issue of material fact existed that would support a finding that Southern's failure to warn was the cause in fact of Mr. Long's injury. We agree with Southern on this issue.

Our analysis begins with a review of the nature of Ms. Long's cause of action. Subsection 29-28-102(6) of the TPLA defines a product liability action as follows:

> (6) "Product liability action" for purposes of this chapter includes all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. "Product liability action" includes, but is not limited to, all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; <u>breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent</u>; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever; . . .

(Emphasis added.) Tennessee Code Annotated § 29-28-105 further provides in pertinent part:

> (a) A manufacturer or seller of a product shall not be liable for any injury to a person or property caused by the product unless the product is

6

determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.

(b) In making this determination, the state of scientific and technological knowledge available to the manufacturer or seller at the time the product was placed on the market, rather than at the time of injury, is applicable. Consideration is given also to the customary designs, methods, standards and techniques of manufacturing, inspecting and testing by other manufacturers or sellers of similar products.

. . .

(d) A product is not unreasonably dangerous because of a failure to adequately warn of a danger or hazard that is apparent to the ordinary user.

*See also Whaley v. Rheem Mfg. Co.*, 900 S.W.2d 296, 299 (Tenn. Ct. App. 1995) ("In order to prevail in a products liability action, a plaintiff must prove that the product in question was either defective or unreasonably dangerous, as those concepts are defined in the Act, at the time it left the control of the manufacturer or seller.").

Ms. Long does not argue that the ball valve was in a defective condition at the time it was placed on the market. *See* Tenn. Code Ann. § 29-28-102(2) (defining "defective condition" as "a condition of a product that renders it unsafe for normal or anticipatable handling and consumption"). She asserts instead that Southern's failure to warn of the specific dangers of high-pressure usage over 5,000 psi and corrosion in water applications rendered the ball valve unreasonably dangerous. Pursuant to Tennessee Code Annotated § 29-28-109(8), "unreasonably dangerous" means

that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller, assuming that the manufacturer or seller knew of its dangerous condition.

*See also Shoemake v. Omniquip Int'l, Inc.*, 152 S.W.3d 567, 574 (Tenn. Ct. App. 2003) ("Where the facts are undisputed, whether a duty to warn exists is determined as a matter of law and, when the danger is open and obvious, no duty to warn is imposed.").

In granting summary judgment to Southern, the trial court found that it had "established that the accident was not caused by any failure to warn." The court further

found that Ms. Long had "not produced evidence to raise a genuine question of fact on the issue." The court summarized the specific undisputed facts relevant to its findings as follows:

1.      The only claim Plaintiff is pursuing against [Defendant] is the failure to warn claim.

2.      On October 30, 2002, Danny Long was injured during the course and scope of his employment with Alstom.

3.      Mr. Long was using the ball valve at issue to release pressure in the test panel designed and assembled by Alstom employees[.]

4.      While Mr. Long was turning the handle on the valve, a component in Alstom's test panel broke, releasing highly pressurized water which injured Mr. Long. The failed component was not a part of the valve sold by the [Defendant].

5.      Alstom purchased the valve for use as a "repair part for a forklift hydraulic system."

6.      Alstom's internal investigation concluded that the valve had been removed from service a few days before Mr. Long's accident because it was difficult to open and close.

7.      Alstom did not repair or discard the faulty valve.

8.      The valve was put into the test panel to replace another valve which was leaking.

9.      The fittings used with the valve in the test panel were not rated for the amount of pressure put through the system in the test during which Mr. Long was injured.

10.     The fixtures used in the test panel did not meet the requirements of the ASME [American Society of Mechanical Engineers] Boiler and Pressure Vessel Code.

11.     Alstom's use of several pipe reducers in the test panel and the fact that the valve and other components in Alstom's test panel were not properly supported was ". . . poor practice" by Alstom.

8

12.     If Alstom had properly supported the valve in its test panel, the stress in the connected components would not have been sufficient to cause the connecting components to fracture.

13.     The manner in which the Alstom's employees designed and assembled the test panel predisposed the connective fittings to fail.

14.     Simple inspection of the valve before its use in the test panel would have alerted the Alstom employee who installed it that the inside of the valve was corroded and it should not be used.

15.     Alstom employees violated Alstom's own safety rules by attaching a previously removed valve to the test panel.

16.     Alstom's safety rules prohibited the use of the valve under the circumstances present in this case.

(Record citations omitted.)  Upon our thorough review of the record, we determine that the trial court correctly found the above facts to be undisputed.[4]

## A.  Danger of Exceeding Ball Valve's Pressure Capacity

Ms. Long argues that the pressure rating stamped on the ball valve was inadequate to warn Alstom employees regarding the danger of exceeding 5,145 psi during hydro testing of Alstom's products.  The ball valve was stamped by its manufacturer, Pister, with the following information:

GERMANY1123
BKH-1NPT
PN-350 DN25
11/98 PCI

It is undisputed that "PN-350" refers to a European pressure rating designated as "BAR" and that a BAR rating of 350 is the equivalent of 5,145 psi.  Two Alstom employees testified by deposition that they had never heard of "BAR" as a measurement, and one employee testified that he thought the "PN" stamped on the valve meant "part number."

---

[4]We recognize that Mr. Long was the only individual who directly witnessed his accident and that he died in December 2006 without giving deposition testimony.  Certain facts, such as his use of an extension or "cheater" bar, were surmised by Alstom employees who came onto the scene after the accident occurred and were subsequently deposed.

PCI's product catalogues listed the subject ball valve's pressure capacity as 5,145 psi. An Alstom employee testified that a ball valve would typically arrive in a box with a packing slip and no additional instructions or warnings.

Regarding the failure-to-warn claim as to the danger of exceeding the pressure capacity of the ball valve, the trial court stated in its final judgment:

> As to the pressure capacity issue, the undisputed facts show that the information pertaining to the pressure capacity of that valve is irrelevant. The valve did not fail. The pressure marking on the valve was in BARS, a European method of measuring pressure. Plaintiff contends it should have been marked in pounds per square inch (p.s.i.), which is the measurement used in the United States. Had the valve supplied by the [Defendant] failed, Plaintiff may have an argument. However, there is no dispute that it was not the valve, but rather a coupling Alstom attached to it, which failed. Even if there is a question of whether the markings denoting BARS, instead of p.s.i. was deficient, that failure to warn did not cause the accident. Therefore, summary judgment must be granted on that issue.

Ms. Long argues that the trial court erred in its finding that the ball valve did not fail because she maintains that "it was the excessive use of pressure through the valve that caused the ball valve to work improperly which in turn caused the connecting [devices] to fail." She thus argues that Southern's failure to warn that excessive use of pressure through the ball valve could cause connecting devices to fail was the cause in fact of Mr. Long's injury. We disagree.

In order to succeed in her claim, Ms. Long would have to show that Southern's alleged failure to warn was both the cause in fact and proximate cause of Mr. Long's injury. *See Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005) ("Causation [in fact] and proximate cause are distinct elements of negligence, and both must be proven by the plaintiff by a preponderance of the evidence.") (quoting *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993)). As this Court has explained:

> The distinction between cause in fact and proximate, or legal, cause is not merely an exercise in semantics. The terms are not interchangeable. Although both cause in fact and proximate, or legal, cause are elements of negligence that the plaintiff must prove, they are very different concepts. *Ridings* [*v. Ralph M. Parsons Co.*,] 914 S.W.2d [79,] 83 [(Tenn. 1996)]; *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993). Cause in fact refers to the cause and effect relationship between the defendant's tortious conduct and the plaintiff's injury or loss. Thus, cause in fact deals with the

> "but for" consequences of an act. The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct. *Kilpatrick*, 868 S.W.2d at 598. In contrast, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. *Id.* Proximate or legal cause is a policy decision made by the legislature or the courts to deny liability for otherwise actionable conduct based on considerations of logic, common sense, policy, precedent and "our more or less inadequately expressed ideas of what justice demands or of what is administratively possible and convenient." *Bain v. Wells*, 936 S.W.2d 618, 625 (Tenn. 1997); *George v. Alexander*, 931 S.W.2d 517, 521 (Tenn. 1996); *Kilpatrick*, 868 S.W.2d at 598; *Smith v. Gore*, 728 S.W.2d 738, 749 (Tenn. 1987).

*Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d 252, 256 n.6 (Tenn. 1997). Therefore, in order to show that the grant of summary judgment was in error, Ms. Long would first have to raise a genuine issue of material fact regarding whether "but for" the lack of a warning from Southern, Mr. Long's injury would not have happened.

As the trial court noted, it was undisputed that the coupling attached by an Alstom employee to the ball valve, not the ball valve itself, broke when Mr. Long attempted to release pressure, causing his injury. In his internal investigation report, Alstom's own investigator, Mark Hogan, described how the accident occurred as follows:

> Employee was in the final steps of hydro testing a super heater panel in bay 44 north. When he turned the dump valve on the test equipment to release the water pressure from the panel. A pipe nipple fatigued and broke causing the water to release immediately. It appeared that the extreme high pressure (6975psi) and rapid release of water caused the lacerations in his left upper arm.

Although Ms. Long and Alstom postulated before the trial court that Alstom's sending too high a pressure through the ball valve caused the attached coupling mechanism to fail, they did not present evidence to this effect. They state on appeal that they rely on the opinion of their expert witness, Dr. Richard Pearson, but Dr. Pearson testified as to the need for a warning regarding pressure exceeding the limit of the ball valve and how that warning could be effectively implemented. Dr. Pearson acknowledged that he was not an expert as to the design, manufacture, or function of ball valves or pressure-testing systems. We conclude that the trial court did not err in finding no existence of a genuine issue of material fact that would show lack of warning regarding pushing pressure over 5,145 psi through the ball valve as the cause in fact of Mr. Long's injury.

11

## B. Danger of Utilizing Ball Valve in Water System

Regarding the failure-to-warn claim as to the danger of using the ball valve in a system conveying water due to potential corrosion, the trial court stated in its final judgment:

The second part of Plaintiff's claim is that [the Defendant] did not warn against using the valve in a system conveying water because water could cause corrosion. Corrosion would make the valve more difficult to open and close creating a danger. For the reasons set forth below, the Court **Grants** summary judgment on that issue also.

In [its motion, the Defendant has] established the following:

1. Alstom ordered the specific valve involved in this accident by part number. In its order, Alstom specified the valve was to be used in repair of hydraulic systems in forklifts.

2. The valve had been in Alstom's possession for more than three years before this accident happened.

3. The valve was removed from service in another application by Alstom employees because it was difficult to operate and dangerous.

4. Alstom's safety rules dictated that, when a part is removed from service for safety reasons, it is to be sent to maintenance for repair or discarded. Neither of those steps [was] taken with this valve.

5. The valve did not fail at the time of the accident.

6. Mr. Long used a breaker bar to operate the valve indicating it was difficult to open or close[.]

7. Mr. Long had the designation of Boilermaker 2 at Alstom, which required he be trained in the maintenance and operation of high pressure vessels and systems.

The danger in using the valve in a water system is that it would corrode and become difficult to operate. Alstom and Mr. Long knew, at the

12

time of the accident, that the valve was difficult to operate. A manufacturer or seller is not required to warn of a danger of which the user is or should be aware. Defendant's motion shifted the burden of proof on this issue to the Plaintiff to provide proof of a question of fact. The Plaintiff did not do so.

(Emphasis in original.)

Having reviewed the record, we agree with the trial court. Mr. Hogan testified through deposition that the valve at issue was removed from service in "Hydro 42" a few days before Mr. Long's accident because the valve was difficult to open or close. According to Mr. Hogan, the valve "was laid on the workbench in the Bay 42 south hydro area." Mr. Hogan stated that he did not know why the ball valve had not been discarded or disposed of after its removal from Hydro 42. He acknowledged that the valve should have been discarded. It is undisputed that when the test panel was assembled in "Hydro 44," the area where the accident occurred, an Alstom employee took the subject ball valve from the work bench in Bay 42 and used it on the panel Mr. Long was testing on October 30, 2002. As the trial court found, Ms. Long and Alstom presented no genuine issue of material fact to counter Southern's proof that Alstom employees knew or should have known that the ball valve was difficult to open and close due to corrosion. Moreover, as explained above, the ball valve itself did not break when the accident occurred. The trial court did not err in finding no existence of a genuine issue of material fact that would show lack of warning regarding the ball valve's use in water systems as the cause in fact of Mr. Long's injury.

V. Dr. Pearson's Expert Witness Testimony

Ms. Long and Alstom contend that the trial court erred by impermissibly weighing and discounting the testimony of their expert witness, Dr. Pearson. Southern asserts that rather than discounting Dr. Pearson's testimony, the trial court found the testimony to be irrelevant to whether a failure to warn of danger caused Mr. Long's injury. We conclude that the trial court properly found that Dr. Pearson's testimony did not impact its finding that Ms. Long and Alstom had failed to raise a genuine issue of material fact that would show that a failure to warn was the cause in fact of Mr. Long's injury.

Regarding testimony by experts, our Supreme Court has explained:

In general, questions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court. The trial court's ruling in this regard may only be overturned if the discretion is arbitrarily exercised or abused. The specific rules of evidence

13

that govern the issue of admissibility of scientific proof in Tennessee are Tenn. R. Evid. 702 and 703. The former provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

And Tenn. R. Evid. 703 states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

*McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263-64 (footnote and internal citations omitted).

"A trial court should admit the testimony of a competent expert unless the party opposing the expert's testimony shows that it will not substantially assist the trier of fact or if the facts or data on which the opinion is based are not trustworthy pursuant to Rules 702 and 703." *Shipley v. Williams*, 350 S.W.3d 527, 551 (Tenn. 2011). As our Supreme Court further explained: "The trial court is not to decide how much weight is to be given to the witness's testimony. Once the minimum requirements are met, any questions the trial court may have about the extent of the witness's knowledge, skill, experience, training, or education pertain only to the weight of the testimony, not to its admissibility." *Id.* In evaluating a motion for summary judgment, the trial court "must not weigh the evidence" once expert testimony has been admitted. *Beaudreau v. Gen. Motors Acceptance Corp.*, 118 S.W.3d 700, 704 (Tenn. Ct. App. 2003); *see, e.g., Rutherford v. Rutherford*, 978 S.W.2d 102, 103-04 (Tenn. Ct. App. 1998) (reversing the trial court's grant of summary judgment on a products liability claim upon concluding that the plaintiffs' expert witness's affidavit raised a genuine issue of material fact as to whether the product was unreasonably dangerous).

Dr. Pearson testified through deposition that he considered himself a specialist in the design of warnings in industrial situations. According to his curriculum vitae, Dr.

Pearson holds a bachelor of science degree in air transportation, a master's degree in industrial psychology, and a doctor of philosophy in experimental psychology. He testifies regularly as a forensic consultant in human factors and safety. Dr. Pearson acknowledged that "[a]part from any issues . . . that involve warning," he does not consider himself an expert in the design, manufacture, sale, operation, use, or service of high-pressure ball valves. He also acknowledged that he could not offer an expert opinion regarding what caused the reducing mechanism attached to the ball valve to break during Mr. Long's accident. Dr. Pearson opined that "it's foreseeable on the part of PCI to know that with the knowledge that this valve is intended strictly for hydraulic use and at a certain pressure that they should let the ultimate user know that." Ms. Long and Alstom presented designs drawn by Dr. Pearson of possible warning signs that could have been used with the ball valve. Southern presented affidavits from engineering experts stating, in pertinent part: "The plaintiff's vaguely referenced warnings are no safer than the information already provided."[5]

While Dr. Pearson designed warning signs that he opined were the type that Southern should have produced to accompany the ball valve in question, he did not offer expert testimony on the actual cause in fact of the accident. We determine that the trial court did not err by finding no existence of a genuine issue of material fact raised by Dr. Pearson's expert testimony as to the cause in fact of Mr. Long's injury.

### VII.  Employer Alstom's Actions as Intervening Cause of Injury

Ms. Long's and Alstom's contention that the trial court erred by finding Alstom's actions as an employer to be an intervening cause of Mr. Long's injury is primarily based in their assertion that Alstom was immune from liability pursuant to Tennessee's workers' compensation law. *See* Tenn. Code Ann. § 50-6-108(a) (2014). As Southern notes, however, while an employer's immunity under workers' compensation law prevents the trial court from assigning liability to the employer, it does not prevent the court from analyzing the employer's actions as a cause in fact of the plaintiff's injury. *See Snyder*, 955 S.W.2d at 256.

The doctrine of an independent intervening cause applies to "relieve a negligent actor from liability" "only when the intervening act (1) was sufficient by itself to cause the injury, (2) was not reasonably foreseeable to the negligent actor, and (3) was not a normal response to the negligent actor's conduct." *Rains v. Bend of the River*, 124 S.W.3d 580, 593 (Tenn. 2003). As our Supreme Court explained in *Rains*:

---

[5]Contrary to Southern's repeated assertion that Ms. Long failed to present evidence that Mr. Long or other Alstom employees would have heeded the warning signs designed by Dr. Pearson, we note that a manufacturer or seller may reasonably assume that its warnings will be heeded by the product's user. *See Shoemake*, 152 S.W.3d at 574 (quoting with approval *Restatement (Second) of Torts*, § 402A, cmt. j)).

"Foreseeability is the key here because no person is expected to protect against harms from events that he or she cannot reasonably anticipate or foresee or which are so unlikely to occur that the risk, although recognizable, would commonly be disregarded."

The trial court in its order granting summary judgment stated in pertinent part:

Alstom's negligence in its choice of components for the test panel, its method of constructing of the test panel and its use of a valve it knew to be dangerous because of the difficulty in operating it, was sufficient, by itself, to cause the accident. It was not reasonably foreseeable to [this Defendant] that Alstom would do what it did in this case. Finally, Alstom's actions were not a normal response to any failure to warn of the pressure capacity of the valve or failure to warn against using it in a water system.

The [Defendant has] established that the cause of the accident was the negligence of Alstom in the manner in which it designed and assembled the test panel. In addition, the use of a valve Alstom knew to be dangerous in a high pressure situation was negligence. As such, [this Defendant] cannot be held liable for an accident caused by the negligence of Alstom and its employees.

We agree with the trial court. Alstom had the subject ball valve in its possession for three years following its purchase of the valve, and employees knew that the valve was difficult to turn. Moreover, the coupling that actually broke during the accident was attached to the ball valve by Alstom employees. Ms. Long failed to present any genuine issue of material fact that could have shown Alstom's actions in this regard to be foreseeable by Southern.

We emphasize that Alstom cannot be held liable for its actions as the proximate, or legal cause of Mr. Long's injury due to Alstom's immunity under Tennessee Code Annotated § 50-6-108(a), which provides:

(a) The rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident, including a minor whether lawfully or unlawfully employed, shall exclude all other rights and remedies of the employee, the employee's personal representative, dependents or next of kin, at common law or otherwise, on account of the injury or death.

16

Such immunity from liability does not, however, prevent the trial court from finding Alstom's actions to be the cause in fact of Mr. Long's injury. As our Supreme Court explained in *Snyder*:

> By enacting Tenn. Code Ann. § 50-6-108(a), the legislature has already determined that for policy reasons the employer may not be the legal cause of the plaintiff's injuries.
>
> This is not to say, however, that the employer cannot be found by the trier of fact to have been a cause in fact of the plaintiff's injuries. If the rule were otherwise, the defendants would effectively be precluded from presenting a defense. A defense that the product was not defective or unreasonably dangerous when it left the defendants' control would not be credible unless the defendants were permitted to introduce evidence as to what actually happened to the product leading up to the incident that injured the plaintiff. Excising the employer from that discussion would be tantamount to drawing a line which would make discussion of the case to be tried difficult, if not impossible. The end result would be that the jury would not hear evidence of the true facts surrounding the product that caused the plaintiff's injuries but, nonetheless, be asked to determine fault and hence liability for damages. Prohibiting the introduction of such evidence could result in a defendant, who was not a cause in fact of the plaintiff's injuries, being required to pay for the harm anyway.

*Snyder*, 955 S.W.2d at 255. Upon our thorough and careful review of the record, we conclude that the trial court did not err in finding Alstom's actions to be an intervening cause of Mr. Long's injury.

## VIII. Conclusion

For the reasons stated above, we affirm the order of the trial court granting summary judgment in favor of Southern Fluidpower, Inc. The costs on appeal are assessed against the appellants, Geraldine Long and Alstom Power, Inc. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

17